BEECH AIRCRAFT CORPORATION,
Appellant,

v.

Lola F. HARVEY, as personal representative of the Estate of James W. Harvey, Deceased, and Germaine A. Chester, as personal representative of the Estate of Lorren R. Chester, Deceased, Appellees.

No. 2513.

Supreme Court of Alaska.

Nov. 26, 1976.

D. A. Burr and Ronald H. Bussey, Burr, Pease & Kurtz, Inc., Anchorage, and Landon Morris, associated with Burr, Pease & Kurtz, Anchorage, for appellant.

L. Ames Luce, Kelly & Luce, Theodore R. Dunn and David Shimek, Matthews, Dunn & Baily, and Michelle V. Minor, Anchorage, for appellees.

Before BOOCHEVER, Chief Justice, RABINOWITZ and CONNOR, Justices, DIMOND, Justice Pro Tem., and VAN HOOMISSEN, Superior Court Judge.

## OPINION

CONNOR, Justice.

This products liability action concerns the death of two men in the crash of a light plane manufactured by appellant. The case was tried by jury before the superior court at Kodiak.

On March 16, 1967, James Harvey and his passenger, Lorren Chester, attempted to take off in an aircraft from Kodiak Municipal Airport. The aircraft crashed into a gravel pile and they died. Plaintiffs are the personal representatives of decedents' estates, suing on behalf of those estates and their various heirs and beneficiaries. The principal dispute in the case concerned the issue of liability. Plaintiffs' theory was that the aircraft's wings had been defectively welded to the craft during construction in 1946 by the manufacturer Beech Aircraft Corporation (Beech), and that as a result a "fatigue crack" had developed in the craft, causing the left wing to fail by "folding up." Beech's theory of the crash was that frost on the wings of the aircraft caused it to stall, resulting in a crash into the gravel pile which overloaded the left wing and fractured it loose from the aircraft.

Much testimony was introduced on both sides, including considerable conflicting expert testimony by many witnesses as to whether the left wing showed fatigue or overload fracturing. Physical evidence and the declaration of an eyewitness were also introduced. The jury returned a verdict against Beech for $1.3 million, which when

combined with prejudgment interest, costs and attorney's fees resulted in a judgment of over $2 million. Mrs. Harvey was awarded $500,000 in damages, and Mrs. Chester $800,000.

One of the principal contentions of Beech is that Judge Burke was biased in favor of plaintiffs. It complains that this bias caused the judge to allow a prejudiced jury to be impaneled, through judicial questioning, the voir dire procedure in general, and the judge's refusal to allow defendants additional peremptory challenges. Beech also asserts that its expert witness Holshouser was erroneously prevented from expressing opinions as to the "ultimate questions" in the case because of his employment as a National Transportation Safety Board (N.T.S.B.) investigator, while plaintiffs' expert Bullard—a Federal Aviation Administration investigator working together with the N.T.S.B. investigators—was permitted to express such opinions.[1] Beech claims error in the admission of the hearsay declaration made to Investigator Bullard by Mr. Arne Flathaug, an eyewitness who died before trial. Finally, Beech argues that the awards of attorney's fees and prejudgment interest were improper.

Before turning to these issues, however, we wish to reaffirm our order of June 26, 1975, denying plaintiffs' request that this appeal be dismissed because it was not timely filed. The arguments presented now are substantially the same as those presented previously, and we see no real benefit from elaborating on our previous order.

### I.

■ The first major issue concerns jury selection. Beech complains that nine of the jurors "had some familiarity or association with the plaintiffs' decedents and their families." This does not surprise us, given that the trial took place in the relatively small community of Kodiak. It is obvious from the transcript that there was considerable difficulty in obtaining a jury at all, because of the number of people who were excused for bias or economic hardship. Our examination of the record convinces us, however, that the composition of the jury was not a result of any misconduct on the part of the judge. He questioned each potential juror to determine impartiality, and then allowed counsel to inquire further. The acquaintance between the deceased and their families and those who ultimately served on the jury was in all instances casual, and each juror said he or she could serve without prejudice. Our review of the record reveals that Judge Burke's conduct of the voir dire was fair and impartial, although animosity between counsel made his task particularly onerous. We do not find an indication of bias in Judge Burke's denial to the defendant of extra peremptory challenges. The good cause claimed by Beech does not, in this case, outweigh the discretion[2] of the trial judge, and his apparent concern for orderly and reasonably expeditious trial procedure.

We further note that some of the jury selection issues were raised about fifteen days after trial began in motions for disqualification of Judge Burke and for a change of venue.[3] At that time, Beech wrote:

"the defendant, Beech Aircraft, does not in any way impune [sic] the integrity or character of the Honorable Edwin [sic] Burke or imply that he is in any way biased or prejudiced against the defendant, Beech Aircraft, in the trial of this case."

We see no justification for Beech to have changed its mind, upon an examination of the record. The claims of error in jury selection must fail.

### II.

The next major question is the treatment of the expert investigators' opinion testimony. 49 U.S.C. § 1441(e) provides:

1. See 49 U.S.C. § 1441(e).

2. See 9 C. Wright and A. Miller, Federal Practice and Procedure, § 2483, at 474 (1971).

3. This matter was principally based on what Beech characterized as the "appearance of impropriety," based on Judge Burke and certain attorneys dining together in public.

"No part of any report or reports of the National Transportation Safety Board relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports."

This statute originally applied to the Civil Aeronautics Board, but in 1966 the function of investigating aircraft crashes was transferred to the National Transportation Safety Board, and along with it the prohibition contained in 49 U.S.C. § 1441(e). *See* 49 U.S.C. §§ 1655(c) and (d), 1901 *et seq.*

■ In interpreting this statute, state courts are bound by the interpretation given by the federal judiciary.[4] *Ratner v. Arrington,* 111 So.2d 82, 84–85 (Fla.App. 1959); *see United States v. Gilbert Associates, Inc.,* 345 U.S. 361, 363, 73 S.Ct. 701, 703, 97 L.Ed. 1071, 1075 (1953). In *Berguido v. Eastern Air Lines,* 317 F.2d 628, 632 (3rd Cir. 1963), the court said:

"the primary thrust of the provision is to exclude C.A.B. reports which express agency views as to the probable cause of the accident. Of necessity, the opinion testimony of the C.A.B.'s investigators would also come within this rule." (Footnote omitted)

The federal courts have split on the precise extent to which *Berguido* requires the exclusion of an investigator's opinion. One side of the argument is represented by *Fi-*

*delity & Casualty Co. v. Frank,* 227 F.Supp. 948, 949 (D.Conn.1964). There the court, purporting to follow *Berguido,* on reconsideration adopted a distinction between "factual" evidence, which could be admitted, and "evaluation, opinion or conclusion evidence," which must be excluded whether or not it relates to the "ultimate question" in the case.[5] But other courts would not exclude all opinions.

"*Berguido* established that qualified testimony going beyond merely personal observations is admissible provided such testimony does not presume to be official agency opinion. . . . [I]t would be better to exclude opinion testimony only when it embraces the probable cause of the accident or the negligence of the defendant." *American Airlines, Inc. v. United States,* 418 F.2d 180, 196 (5th Cir. 1969).[6]

■ The trial court below in the case at bar adopted the "ultimate question" test, rather than the *Frank* rule. Its judgment was later vindicated when, on July 17, 1975, the N.T.S.B. itself adopted this policy by allowing its investigators to testify to all opinions except those going to the "ultimate determination of cause or probable cause determined by the Board and expressed in the Board's reports."[7] In so doing, the Board expressed a belief that its new policy was consistent with federal case law, specifically with *Kline v. Martin,* 345 F.Supp. 31, 32 (E.D.Va.1972).[8] Based on federal law as

---

**4.** Thus *Adkins v. Lester,* 530 P.2d 11, 17 (Alaska 1974), interpreting AS 28.35.120, is inapplicable to the case at bar. Additionally, in *Adkins* we recognized that 49 U.S.C. § 1441(e) is "broader in scope" than AS 28.35.120. We do note that under proper circumstances, as a matter of general law, experts are not precluded from testifying as to the ultimate issues in a case. 530 P.2d at 16.

**5.** The court originally adopted the narrower "ultimate question" test (*see* 214 F.Supp. 803, 805 (D.Conn.1963)), but rejected it upon reconsideration. 227 F.Supp. at 949.

**6.** *Accord, Kline v. Martin,* 345 F.Supp. 31, 32 (E.D.Va.1972), which held that opinions not going to the "ultimate question" would be admitted.

**7.** National Transportation Safety Board, 40 Fed.Reg. 30232 (July 17, 1975). The regulation

is codified at 49 C.F.R. § 835.3 (1975). The N.T.S.B.'s position at the time of trial was that all opinion testimony was inadmissible. The interpretation of the Board is entitled to a certain amount of "consideration and respect" in Alaska Courts. *Whaley v. State,* 438 P.2d 718, 722 (Alaska 1968); *see Mobil Oil Co. v. Local Boundary Comm'n,* 518 P.2d 92, 103 n.34 (Alaska 1974); *see also Moore v. State,* 553 P.2d 8, 26 (Alaska 1976); *State v. Aleut Corp.,* 541 P.2d 730, 736–37 & n.13 (Alaska 1975).

**8.** We note that in *Kline v. Martin, supra,* the district court in dictum expressed doubt as to whether § 1441(e) really does exclude the opinions of investigators at all, but rather only the official reports of the N.T.S.B., despite the language of *Berguido.* 345 F.Supp. at 32. We are unwilling to extend this dictum in the face of the apparently well-established *Berguido* doctrine under federal law.

it stands today, we affirm the trial judge's decision on the permissible scope of opinion testimony under § 1441(e).

■ Beech argues that the excluded opinion testimony of its expert metallurgist, Holshouser, did not go to the "ultimate issue" in the case.[9] The testimony that elicited the ruling was:

"Q. Would you tell me as best you recall what the bottom fittings on the Kodiak accident case that you examined looked like?

A. Well, they looked like overload."

Since the ultimate question of "the probable cause of the accident"[10] was whether the plane wing fractured because of fatigue (causing the plane to crash) or overload (caused by the plane's crash), we conclude that this opinion was properly excluded.

On the other hand, plaintiffs' expert, Bullard, was permitted to testify to his opinion as to the cause of the accident. He stated that "[f]ailure of the left wing attach points is what caused the accident."[11]

Plaintiffs contend that since Bullard's opinion as to the cause of the crash did not agree with the ultimate opinion of the N.T.S.B., it is therefore admissible. As a matter of policy, we find this position unacceptable. If the purpose of 49 U.S.C. § 1441(e) is to prevent introduction of "reports expressing agency views about matters that are within the functions of the courts and juries to decide,"[12] then it would be anomalous to allow in only official reports supporting the opposite conclusion from that of the Board. *Cf. Universal Airline v. Eastern Air Lines,* 88 U.S.App.D.C. 219, 188 F.2d 993, 998 (1951).

Plaintiffs also contend that since Bullard was employed by the Federal Aviation Administration (F.A.A.), not the N.T.S.B., he should be permitted to testify. There was some testimony adduced at trial as to his actual connection with the N.T.S.B. investigation. We do not reach this issue, since objection to Bullard's opinion based on 49 U.S.C. § 1441(e) was not lodged until two weeks after the testimony was presented to the jury.[13] Beech knew of the § 1441(e) issue when it questioned Bullard—its counsel cross-examined the witness on his relationship with the N.T.S.B. Thus Beech, in failing to object, relinquished a known right. It has waived its objection. 1 J. Wigmore, Evidence § 18, at 323–25, 344 (3d ed. 1940).

### III.[14]

Beech's next major contention concerns the admission of a declaration made by one Arne Flathaug, who witnessed some of the events leading up to the accident, and who was dead at the time of trial. Flathaug's written statement was excluded at trial, but Bullard's oral account of his interview with Flathaug was admitted into evidence, over objection.

Just what Arne Flathaug saw was a hotly contested issue in the case. The written statement described the situation as follows:

"I was driving north on the road parallel to the air strip when I saw an aircraft take off the runway going north. What made me wonder is that I saw the left wing much higher than the right wing, it looked to me that the aircraft was mak-

9. Holshouser was permitted to testify to certain opinions on the evidence, apparently deemed not to be "ultimate questions".

10. *American Airlines, Inc. v. United States,* 418 F.2d 180, 196 (5th Cir. 1969).

11. The N.T.S.B. report on the crash had concluded that frost on the wings of the aircraft caused it to stall, resulting in a crash into the gravel pile which overloaded the left wing and fractured it loose from the aircraft.

12. *Lobel v. American Airlines,* 192 F.2d 217, 220 (2d Cir. 1951), *cert. denied,* 342 U.S. 945, 72 S.Ct. 558, 96 L.Ed. 703 (1952).

13. The objection taken at the time went to the use of a hypothetical question.

14. Part III of this opinion reflects the views of only the author. For the reasons stated in their separate opinion, Justice Dimond and Chief Justice Boochever join me in voting to affirm the judgment.

ing a right turn, the right wing was about 10–15 feet off the ground."

Bullard testified that Flathaug told him: "That it was left wing high, similar to a turn but the right wing was 10 or 15 foot [sic] off the ground . . ."

If the plane was "making a right turn", with the left wing high and the right wing low, it would not indicate any structural damage before the crash. However, if the left wing was high but the right wing was *not* low, it would support the plaintiffs' theory that the left wing had "folded up" in flight, causing the accident.

 The statement, as related by Bullard, was hearsay. The trial judge admitted it, under an exception to the hearsay rule, as an "excited utterance." *Cf. Watson v. State,* 387 P.2d 289, 291 (Alaska 1963). Fed.R.Evid. 803(2) defines this as:

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

*See also* Uniform Rule of Evidence 803(2); California Evidence Code § 1240. The trial court admitted the testimony, with a cautionary instruction, in part because of the catastrophic nature of the crash, which would cause excitement to linger, and in part because Flathaug was not connected with the case or parties and had no motive to fabricate.

We hold that this is not sufficient to warrant admission of this evidence under either an "excited utterance" or a "spontaneous declaration" theory. Bullard testified that his interview with Flathaug occurred either the day of the accident or the day after, but inclined toward the view that it was the day after. In general,

"[t]he test to be applied by the judge is: was the declaration spontaneous, excited,

or impulsive, or was it the product of reflection and deliberation?" C. McCormick, Law of Evidence § 272, at 580 (1954). *Accord, Id.* § 297, at 705 (2d ed. 1972).

Flathaug's statement, made to an investigator [15] the day after the crash, was hardly an "instinctive" result of the incident (such as an involuntary shout while observing the crash), but was rather a "deliberative" narration of past events. *See* Morgan, *Res Gestae,* 12 Wash.L.Rev. 91, 96 (1937). Unlike the declarants in *Torres v. State,* 519 P.2d 788, 792–93 (Alaska 1974) and *May v. Wright,* 62 Wash.2d 69, 381 P.2d 601, 604 (1963), Flathaug was not emotionally upset when questioned, but rather appeared "calm." We further note that Flathaug's statement was not a "present sense impression," since he was not relating the events while or immediately after perceiving them. *See* Fed.R.Evid. 803(1) & Advisory Committee Note; Uniform Rule of Evidence 803(1); *see generally* C. McCormick, Law of Evidence § 298, at 710 (2d ed. 1972).

Plaintiffs ask us to adopt the hearsay exception for "statements of recent perception" in Alaska. This exception would admit, if the declarant is unavailable at trial:

"A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear." [16]

While two of my colleagues would adopt this exception, I am not persuaded that we ought to do so. This exception was contained in the proposed Federal Rules of Evidence submitted to Congress, but was deleted by the House Committee on the

**15.** *See Itzkowitz v. P. H. Reubel & Co.,* 158 Ark. 454, 250 S.W. 535, 537 (1923); *Brooks v. Gilbert,* 250 Iowa 1164, 98 N.W.2d 309, 314–15 (1959); *Brown v. Rogers,* 19 Md.App. 562, 313 A.2d 547, 551 (1974). But it is true that he was a disinterested witness. *See May v. Wright,* 62 Wash.2d 69, 381 P.2d 601, 604 (1963).

**16.** Proposed Fed.R.Evid. 804(b)(2), in Am. Jur.2d New Topic Service, *Federal Rules of Evidence,* App. 6 at 541; *see also* Uniform Rule of Evidence 804(b)(5); *see generally* 5 J. Wigmore, Evidence § 1576, at 529 (Chadbourn rev.ed.1974); 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 804(b)(5)[02] at 804–103 to 804–112 (1975).

Judiciary. They were troubled both by the great breadth of this hearsay exception in comparison to most of the generally recognized exceptions, and by the possibility that some of the statements within the scope of the exception did not have sufficient guarantees of trustworthiness.[17] I agree with Judge Weinstein and the scholars he quotes, that this exception is so broad that some of its potential applications raise troubling questions of public policy and, in criminal cases, constitutionality under the confrontation clause.[18]

In its place, Congress enacted Federal Rule of Evidence 804(b)(5), which provides:

> "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . *(5) Other exceptions.*—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."[19]

The Flathaug statement would not, in our view, have been admissible under the federal rule as adopted, because of subsections (B) and (C). It is entirely unclear just what Flathaug meant by his declaration. This dispute could only be resolved by cross-examination, but Flathaug is dead. The declaration in this case, then, has little probative value, since any conclusion as to the meaning of the statement is purely speculative. Thus one reason for excluding the statement as hearsay—that cross-examination is impossible—is particularly relevant to this case. We hold that even if an open-ended hearsay exception such as Federal Rule 804(b)(5) were adopted in Alaska, the Flathaug statement would still be excludable hearsay. Thus we do not reach the question of whether to adopt that test, and we express no opinion on that issue.

Having decided that the Flathaug statement was improperly admitted, we must also decide if such admission was harmless error.

Beech argues that Flathaug's description of the left wing folding upward was so vivid and understandable that the jury must have been heavily influenced by it. Plaintiffs meet this by asserting that Bullard's opinion was merely bolstered by Flathaug's statement, and that the statement was not a crucial underpinning of Bullard's opinion.

Our view of the record reveals that Bullard was an experienced pilot, was an aircraft mechanic and had participated in several hundred aircraft accident investigations. He spent about 200 hours investigating the Harvey crash and writing a report thereon to the F.A.A. He premised his conclusion upon a number of physical facts which had little to do with Flathaug's statement. Among these facts were the following:

1. There was evidence of extensive paint flaking along the flight path of the aircraft.[20]

17. H.Rept. 93–650, 93rd Cong., 1st Sess. 6 (1973), reprinted in Am.Jur.2d New Topic Service, Federal Rules of Evidence 164 (1975). *See* Note, Rule 8–04(b)(2) of the Proposed Federal Rules of Evidence: A Step Too Far? 4 Valparaiso U.L.Rev. 327 (1970).

18. 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 804(b)(5)[02] at 804–109 to 804–112.

19. The federal rule requires that notice be provided to the adverse party if this exception is to be relied upon. Beech asserts that plaintiffs have not complied with this requirement. Since we make no determination on the applicability of the rule, we also make no determination on the applicability of any procedural requirements that might attach to it.

20. In this connection the following must be noted: the aircraft was painted white with yellow trim; sixty to seventy paint chips (most of them white) were found along the flight path; two yellow chips were positively identified, through microscopic, spectrographic, and chromatographic analysis, as having come from the Harvey aircraft; various other paint chips could not be identified positively as coming

2. The lower wing skin was torn in a manner indicative of fracturing.

3. The upper attach fitting was rotated 90° upward from the position of the lower fitting.

4. The top wing skin was folded back along the line of separation of the outboard wing.

5. For some reason the landing gear had not been retracted after takeoff.

6. The physical appearance of the failed fittings showed upward rotation.

7. The left wing leading edge showed no substantial impact damage and there was no impact mark for the left wing on the gravel pile.

Moreover, Bullard testified that in his opinion the left wing folded upward only a moment before impact.[21] It is of considerable significance that when the Flathaug statement was introduced the trial court gave the jury an extended cautionary instruction concerning the statement.[22] This, coupled with the final instruction to the jury on evaluating expert testimony, served to alert the jury to the possible unreliability of and defects in Flathaug's statement.

Graham L. Mower, a private accident investigator who also interviewed and took a written statement from Flathaug, testified for the defense, and related Flathaug's observations quite differently than did Bullard. Mower said that Flathaug "saw an airplane just off the end of the runway with the right wing down, the left wing up and the fuselage level." Mower also said Flathaug described the airplane as banked to the right. This is almost identical to the written statement Flathaug gave the N.T. S.B., and supports Beech's theory of the case. Thus the jury heard both versions of Flathaug's statement.

In light of the whole record, the inherent vagueness in the statement attributed to Flathaug,[23] and the court's instructions, we conclude that the error in admitting the Flathaug statement did not substantially affect the verdict. It was, therefore, harm-

---

from the Harvey aircraft, but all came from the area of the flight path; no chips were found outside the flight path area; the chips were lying near the surface of the snow and had neither been covered by snowfall nor worked their way into the snow; and all of the chips were white or yellow.

21. Flathaug, on the other hand, had said that he saw the aircraft "right after it left" the runway. This discrepancy was never called to Bullard's attention on cross-examination. It may suggest that he did not give credence to Flathaug's observation in drawing his conclusions. However, since Bullard testified that the time from takeoff to the crash was at most two seconds, the two might not be inconsistent.

22. The instruction was:
"I want to instruct you and give the following cautionary Instruction concerning any testimony here in Court about out-of-Court statements by Mr. Flathaug. Mr. Flathaug is now dead. I have decided to allow that testimony under an exception to the hearsay rule. And it's admitted subject to the following cautionary Instruction: No. 1, the statement is being admitted as an exception to the hearsay rule. No. 2, you should keep in mind the fact that the witness is now dead and not available to any party in this litigation for further examination or questioning. No. 3, that at the time Mr. Flathaug gave any statement that he might have given, he was not under Oath as

the other witnesses in this case are required to be. No. 4, because he is not here under Oath and because he is now dead, the Defendants in this case will have no opportunity to cross examine Mr. Flathaug or to test his powers of observation, what he saw, the details of what he saw, by Cross Examination. And finally, that unlike the other witnesses in the case, you will not be in a position to observe Mr. Flathaug during the making of his statement; therefore you cannot have an opportunity to observe his appearance, his demeanor, the manner in which he testifies, and other matters of that nature, which properly may be considered by you in evaluating the testimony of any witness.
Because of all of those things, Ladies and Gentlemen, I will instruct you that you are to view the testimony concerning any out-of-Court statement by the deceased Mr. Arnie [sic] Flathaug with caution."

23. Cross-examination of Bullard, who had visited the scene with Flathaug shortly after the crash, developed that when Flathaug made his observations, he was driving at 20–25 miles per hour on a fairly narrow road, with his view of the plane obstructed part of the time. He had to look away from the road to see the plane. The entire sequence from the plane lifting off the runway to the crash took two seconds or less.

less error. *Love v. State*, 457 P.2d 622, 630–31 (Alaska 1969); *Martinez v. Bullock*, 535 P.2d 1200, 1206 (Alaska 1975).

## IV.

Beech asserts that the award of attorney's fees of $192,111.00 pursuant to the Civil Rule 82(a) formula was erroneous.

■ Plaintiffs assert that Beech waived its right to challenge the award because it failed to object to the proposed judgment under Civil Rule 78(b). Beech argues that it timely filed a Rule 59(f) motion to amend judgment, and that Rule 78 is merely an alternative to Rule 59.[24] The trial court agreed, and further found that Civil Rule 94 (Relaxation of Rules) would permit him to hear the matter. We agree that Beech's contentions should be considered on the merits.

■ Our review of the record reveals that over seven years elapsed between the filing of this action and its resolution at the trial court level. During that time six different attorneys entered appearances, and numerous other attorneys performed substantial work in connection with the case. It is well known that an aircraft products liability case requires large amounts of time and effort in order to prepare it properly for presentation at trial. The trial in this case was four weeks in length. Three attorneys participated in the trial as counsel for plaintiffs. Plaintiffs were required to oppose a petition for review to this court, as well as resist efforts to have the case removed to the United States District Court.

In view of the complexity of the issues, the time during which the case was pending before trial, the amount of potential liability, and the amount of trial preparation and presentation, we hold that the trial court was not manifestly unreasonable in exercising his discretion to award attorney's fees under the Rule 82(a) formula.

## V.

Beech asserts that prejudgment interest of $604,110.00[25] was improperly assessed against it. It argues that the interest covers 7½[26] years, a period "of time greatly in excess of the time reasonably needed for the preparation of the respective cases, and for which Beech was not responsible."[27]

Plaintiffs first assert that Beech cannot question the award of prejudgment interest because its motion was untimely filed. The same arguments are made as were presented in relation to the issue of attorneys' fees. Our decision on the timeliness of Beech's objection to the award of attorney's fees applies here. We will consider the question on the merits.

Beech's argument is that because lengthy delays were attributable to plaintiffs,[28] Beech should not be charged with interest for that period. *Hedla v. McCool*, 476 F.2d 1223 (9th Cir. 1973) (interpreting Alaska law).[29] This is based on *State v. Phillips*,

---

**24.** The jury returned its verdict on December 13, 1974, and a notice of entry of judgment dated the same day appears in the record. The judgment in the case was not signed until January 17, 1975, however, and not docketed until February 4. Civil Rule 59(f) permits a motion to amend judgment to be filed 10 days after "entry" of judgment; Civil Rule 58 defines "entry" as the "notation of a judgment in the civil docket as provided by Rule 74. . . . " Hence Beech's motion, filed on February 6, was timely in that it was filed only 2 days after the judgment was docketed.

**25.** $232,350.00 to Lola Harvey plus $371,760.00 to Germaine Chester.

**26.** From the date of the accident (March 16, 1967) to the date the jury brought in its verdict (December 13, 1974).

**27.** It appears that the case was continued, at least in part, due to the illness of plaintiffs' head counsel, Thomas E. Curran, Jr. Curran relinquished control to his co-counsel, L. Ames Luce on June 28, 1974.

**28.** Plaintiffs argue that "Beech could have moved for trial if it had desired to do so," and notes that Beech engaged in discovery during the alleged period of delay (April 1970 to August 1974).

**29.** *Accord*, Petition of Risdal & Anderson, Inc., 291 F.Supp. 353, 358 (D.Mass.1968). In *Risdal* the court reduced the interest rate award to 4% because of prosecution delays. It appears, however, that the trial judge has discretion in such federal cases as to the interest awarded, and awards have gone as high as 12%. AS 45.45.010(a) allows for no such discretion, at

470 P.2d 266, 274 (Alaska 1970) which provided that prejudgment interest would be assessed "unless for some reason peculiar to an individual case such an award of interest would do an injustice." [30]

▉▉▉ Beech, and the 9th Circuit in *McCool,* have misread Alaska law. "Whenever any cause of action accrues . . . the amount later adjudicated as damages is immediately 'due' . . . ." *State v. Phillips, supra.* Such prejudgment interest is in the nature of compensatory damages for the use of the money by defendants, not a penalty. *Davis v. Chism,* 513 P.2d 475, 481–82 (Alaska 1973). Although prejudgment interest will not be awarded if it would result in "injustice" under *State v. Phillips, supra,* "in only the most unusual case would pre-judgment interest not be proper." *Davis v. Chism, supra,* 513 P.2d at 481. An award of prejudgment interest would be unjust, for example, if it would result in double recovery.[31] Regardless of whose fault it was that such a long period elapsed between the event and judgment, Beech has still had the use of the money for this time, and plaintiffs have lost the "use of the money to which [they have] been entitled." *Davis v. Chism, supra* at 481.

In the circumstances of this case, we see no injustice in the award of prejudgment interest against Beech at the legal rate of 6% per annum.

AFFIRMED.

DIMOND, Justice Pro Tem., with whom BOOCHEVER, C. J., joins, concurring in part and dissenting in part.

RABINOWITZ, J., with whom VAN HOOMISSEN, Superior Court Judge, joins, dissenting in part.

ERWIN and BURKE, JJ., not participating.

DIMOND, Justice Pro Tem., in which BOOCHEVER, Chief Justice, joins.

I agree with most of what my colleague, Justice Connor, has said in his opinion. But I cannot agree with that portion which holds that the admission into evidence of Arne Flathaug's statement to Bullard was error, even though harmless in nature.

Two basic reasons for rejection of hearsay are that it has no inherent likelihood of truthfulness and cannot be tested by cross-examination. But there are now so many exceptions to the rule excluding hearsay evidence, I doubt the first reason for excluding it has much to recommend it. To say there is no likelihood of truthfulness in hearsay runs counter to the fact that in business and the ordinary affairs of life, hearsay is almost universally recognized as an accurate source of information.[1]

The second reason for excluding hearsay—lack of opportunity for cross-examination—has more to recommend it. An exacting and intelligent cross-examination in some cases can do much to test the accuracy of a witness's recollection of what he saw. We have recognized the importance of cross-examination. For example, in *Jefferson v. Metropolitan Mortgage & Securities Company of Alaska,*[2] we stated:

> It is a fundamental precept of common law that before testimony may sustain a cause of action, it must be subject to cross-examination. The right of trial necessarily confers the right to confront and cross-examine adverse witnesses.[3]

least absent "injustice" as provided in *State v. Phillips,* 470 P.2d 266, 274 (Alaska 1970).

**30.** *Phillips* originally dealt with judgments against the state under AS 09.50.280. The rationale has been extended beyond suits against the state. *See, e. g., National Bank of Alaska v. J.B.L. & K. of Alaska, Inc.,* 546 P.2d 579, 590–91 (Alaska 1976); AS 45.45.010(a).

**31.** *ERA Helicopters, Inc. v. Digicon Alaska, Inc.,* 518 P.2d 1057, 1063 (Alaska 1974); *State v. Stanley,* 506 P.2d 1284, 1295 (Alaska 1973),

both providing that if damages for loss of use have been awarded, prejudgment interest is inappropriate because such compensation has already been made.

**1.** *United States v. Costello,* 221 F.2d 668, 678 (2nd Cir. 1955), cited in *State v. Gieffels,* 554 P.2d 460 (Alaska 1976).

**2.** 503 P.2d 1396 (Alaska 1972).

**3.** *Id.* at 1398.

But this fundamental right is subject to exceptions under the hearsay rule. An example is a spontaneous declaration or excited utterance made under the stress or excitement produced by a startling event. The traditional rule is that in order to allow such a declaration to be admissible as an exception to the hearsay rule, the declaration or utterance must be made before the declarant has had sufficient time to reflect on his statement.[4] The basis for admission is the presumption that the statement is sincere and accurate because it is spontaneous. The basis for excluding the statement, with the passage of time between the event and the statement, is that the declarant may weigh the consequences of his thoughts and ultimately add design to the statement he makes.[5]

In this case, the trial judge considered Flathaug's statement an excited utterance and allowed Bullard's testimony on that basis. It is doubtful, however, that the judge chose the correct exception to the hearsay rule. Flathaug's statement was made the day after the accident, and Bullard testified that he seemed calm.

I believe the exceptions to the hearsay rule should be expanded to include statements which have indicia of trustworthiness, and are made not long after the excitement is over. I would adopt Rule 804(b)(5) of the Uniform Rules of Evidence which allows as an exception to the hearsay rule a statement of recent perception where the declarant is dead (such as in this case), or is otherwise unable to testify. That rule provides that there may be admitted, as an exception to the hearsay rule,

> [A] statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim,

which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear.[6]

Flathaug's statement meets the requirements of this rule. His statement was not in response to an investigation, litigation, or settlement of a claim. Bullard, an FAA inspector, was investigating the accident, but he was not investigating, litigating, or settling a claim. This investigation was purely for governmental purposes in order to determine the cause of the accident. Bullard had no relation to the parties to this litigation and his investigation was not in any way related to the litigation that grew out of the accident.

The statement Flathaug made described an event that was "recently perceived" by him—it being the day after the accident that he narrated what he saw to Bullard. As to "good faith", there is nothing in the record to suggest in any way that Flathaug's statement was made otherwise.

The statement was not made in contemplation of pending or anticipated litigation in which Flathaug was interested, because there is nothing in the record to show that he had any relation to the parties involved here or was in any way interested in the ensuing litigation. Finally, as to the requirement that his recollection was clear, I submit that a statement made the day following the accident satisfied such requirement. There was an insufficient lapse of time for memory to fade so as to detract from the accuracy of the statement.

Flathaug was dead at the time of trial. He was the last person to see the airplane

---

4. *See, Torres v. State,* 519 P.2d 788, 792–93 (Alaska 1974); *United States v. Mountain State Fabricating Co.,* 282 F.2d 263, 266 (4th Cir. 1960).

5. Note, Rule 804(b)(2) of the proposed Federal Rules of Evidence: A Step Too Far?, 4 Valparaiso L.Rev. 327, 335–36 (1970).

6. Uniform Rules of Evidence (1974), 13 Uniform Laws Annotated 247 (1975). This is nearly the same as Rule 804(b)(2) of the proposed Federal Rules of Evidence—the difference being that the Uniform Rule applies only to civil actions, whereas the federal counterpart does not have that limitation and presumably would be applicable in criminal actions also. *See,* 51 F.R.D. 438 (1971). The United States Congress declined to include this rule in adopting the Federal Rules of Evidence. I do not here reach the issue of whether the rule should apply to criminal actions.

in the air seconds before it crashed. He stated to Bullard what he saw, which was information pertinent to the jury's effort to ascertain the cause of the accident. I believe that the lack of opportunity for cross-examination of Flathaug is outweighed by the necessity of allowing his statement in evidence in order to allow the jury to consider all relevant facts.

I do not believe that the recent perception exception, satisfying as far as possible the requirements of trustworthiness, is a material departure from the reasons for the general rule excluding hearsay. Exceptions to the hearsay rule are not static, and I think Uniform Rule 804(b)(5) commends itself as a "just addition to the present sharply defined exceptions, and . . . represents the enlightened policy of the future." [7] As is stated in the 1974 revision of Wigmore on Evidence:

> The needless obstruction to investigation of truth caused by the hearsay rule is due mainly to the inflexibility of its exceptions, to the rigidly technical construction of those exceptions by the courts . ., and to the enforcement of the rule when its contravention would do no harm, but would assist in obtaining a complete understanding of the transaction.[8]

Although not requested to do so, Judge Burke gave the following cautionary instruction to the jury before Bullard testified as to what Flathaug had told him:

> I want to instruct you and give the following cautionary Instruction concerning any testimony here in Court about out-of-Court statements by Mr. Flathaug. Mr. Flathaug is now dead. I have decided to allow that testimony under an exception to the hearsay rule. And it's admitted subject to the following cautionary Instruction: No. 1, the statement is being admitted as an exception to the hearsay rule. No. 2, you should keep in mind the fact that the witness is now dead and not available to any party in this litigation

for further examination or questioning. No. 3, that at the time Mr. Flathaug gave any statement that he might have given, he was not under Oath as the other witnesses in this case are required to be. No. 4, because he is not here under Oath and because he is now dead, the Defendants in this case will have no opportunity to cross examine Mr. Flathaug or to test his powers of observation, what he saw, the details of what he saw, by Cross Examination. And finally, that unlike the other witnesses in the case, you will not be in a position to observe Mr. Flathaug during the making of his statement; therefore you cannot have an opportunity to observe his appearance, his demeanor, the manner in which he testifies, and other matters of that nature, which properly may be considered by you in evaluating the testimony of any witness.

> Because of all of those things, Ladies and Gentlemen, I will instruct you that you are to view the testimony concerning any out-of-Court statement by the deceased Mr. Arne Flathaug with caution.

I believe this excellent instruction obviated any prejudice that one might believe was present in allowing Flathaug's statement in evidence as an exception to the hearsay rule which, of necessity, deprived Beech of the opportunity of cross-examining the deceased witness, Flathaug. Furthermore, it was not given at the end of a lengthy trial, but immediately before the statement was admitted, so that the judge's admonition was fresh in the jurors' minds when they heard the testimony.

I would not require that such an instruction be mandatory. But it ought to be given when requested or when the trial judge, in his discretion, believes it wise to do so.

I agree with Justice Connor that the judgment should be affirmed.

7. *See,* V Wigmore on Evidence § 1576 at 529 (Chadbourn Rev. 1974).

8. V Wigmore on Evidence § 1427 at 257 (Chadbourn Rev. 1974).

RABINOWITZ, Justice, with whom VAN HOOMISSEN, Superior Court Judge, joins, dissenting in part.

I am in agreement with the majority's resolution of all questions in this appeal with the exception of the Flaghaug statement—harmless error issue. For I cannot say, with any degree of fair assurance, upon consideration of the whole record, that the jury's verdict was not substantially swayed by virtue of the superior court's admission of the Flathaug statement. Thus, I conclude that the admission of the Flathaug hearsay statement was prejudicial error under *Love v. State*.[1]

In my opinion there exists a fundamental difference between Flathaug's written statement, which was excluded, and Bullard's version of what Flathaug told him.[2] Study of the two statements leads me to the conclusion that Flathaug's written statement is consistent with Beech's theory that the aircraft failed to develop sufficient air speed after lifting off while Bullard's interpretation of what Flathaug told him is supportive of Bullard's thesis that the cause of the crash was the inflight structural failure of the craft's left wing.

Given the discrepancy between the Flathaug written statement and Bullard's version of what Flathaug told him he observed, and the fact that only the latter version was made known to the jury, the error in admitting Bullard's version has added significance. For my reading of the record discloses that Bullard's version and interpretation of the Flathaug statement played a significant role in the shaping and fur-

nishing of foundational support for Bullard's opinion as to the cause of the crash.

Thus, I would conclude that the matter must be remanded for a new trial.

I was driving north on the road parallel to the air strip when I saw an aircraft take off the runway going north. What made me wonder is that I saw the left wing much higher than the right wing, it looked to me that the aircraft was making a right turn, the right wing was about 10–15 feet off the ground.

On the other hand Bullard testified that Flathaug told him

[t]hat it was left wing high, similar to a turn but the right wing was 10 or 15 feet off the ground . . .

---

1. In adopting the test articulated by Justice Rutledge in *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557, 1567 (1946), we concluded in *Love v. State,* 457 P.2d 622, 632 (Alaska 1969), that "[w]e cannot fairly say that the experimental evidence did not appreciably affect the jury's verdict against appellants."

In *Martinez v. Bullock,* 535 P.2d 1200, 1206 (Alaska 1975), it was concluded that ". . . we will employ the *Kotteakos* principles in evaluating the importance of errors in civil cases."

2. The written statement in part contained the following description: