569 F.2d 547
 Thelma A. KEEN, surviving wife of Francis Robert Keen,
Deceased, Individually and on behalf of F. R. Keen
and Ann Miller, surviving kin of Francis
Robert Keen, Deceased,
Plaintiff-Appellant,
v.
DETROIT DIESEL ALLISON and Detroit Diesel Engine, Divisions
of General Motors Corporation, a Delaware
Corporation, Defendants-Appellees.
 No. 76-1844.
 United States Court of Appeals,
Tenth Circuit.
 Submitted Dec. 14, 1977.
Decided April 3, 1978.
Rehearing Denied May 18, 1978.
 
 John W. Norman of Lampkin, Wolfe, Burger, McCaffrey & Norman, Oklahoma City, Okl., for plaintiff-appellant.
 Russell B. Holloway, Oklahoma City, Okl. (Gary C. Bachman and William C. McAlister, Oklahoma City, Okl., on brief), Rhodes, Hieronymus, Holloway & Wilson, Oklahoma City, Okl., for defendants-appellees.
 Before McWILLIAMS, BARRETT and McKAY, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Thelma A. Keen (Keen) appeals from an adverse judgment after a jury trial in a diversity action for wrongful death brought against Detroit Diesel Allison and Detroit Diesel Engine (Detroit Diesel). This case is before us for the second time. On the first appeal, No. 74-1529, decided July 14, 1975, we reversed a dismissal and remanded for further proceedings.
 
 
 2
 Keen's husband, Robert Keen, an experienced Federal Aviation Administration (FAA) jet pilot, was killed when the plane he was piloting crashed during a test flight. Keen filed an action shortly thereafter, alleging that the plane's engine turbine shaft and wheel assembly were defective. She sought recovery under the Oklahoma doctrines of "strict liability in tort and breach of implied warranty of fitness for purpose intended." Detroit Diesel defended on the basis that the turbine shaft and wheel assembly were not defective, that the alleged defect was not the proximate cause of the accident, and that pilot incapacity caused the crash.
 
 
 3
 Keen developed her case around the testimony of six witnesses, including two eyewitnesses who lived within several miles of the crash; an "engine manager" employed by the FAA who was responsible for engine repairs and overhauling; a consulting engineer who concluded that an engine failure had occurred in flight; a metallurgist who concluded that the turbine shaft and wheel appeared to be defective because "oxidation observed at the contact surface between the wheel and the shaft (was) indicative of a partial separation"; and a pathologist who concluded that Robert Keen was alive at the time of the crash. Keen also called a doctor on rebuttal who testified that he had treated Robert Keen several months prior to his death.
 
 
 4
 Detroit Diesel developed its defense around the testimony of a number of witnesses, the introduction of certain physical evidence and twenty-six admissions of fact. Detroit Diesel's witnesses included: an FAA aircraft maintenance supervisor who examined the crash site and determined that the plane had crashed into the ground at a very steep angle with the engine under full power; an air safety investigator with the National Transportation Safety Board who concluded that the aircraft was functioning normally at high power at the time it stuck the ground; and an FAA flight certification doctor who testified that he would not have certified Robert Keen for flight had he known that Robert Keen was being treated for high blood pressure by a Dr. Kraft.
 
 
 5
 On appeal Keen contends the trial court erred in: (1) permitting federal safety investigators to testify; (2) allowing Detroit Diesel to call one Dr. Brant as a witness; and (3) in allowing defense counsel to read the request for admissions to the jury.
 
 
 6
 At the outset we observe that appellate courts cannot try a case de novo, Volis v. Puritan Life Insurance Company, 548 F.2d 895 (10th Cir. 1977), and that the admission of evidence is discretionary with the trial court and will not be disturbed on appeal unless clearly erroneous. Silver v. Cormier, 529 F.2d 161 (10th Cir. 1976); Pipeliners Local Union No. 798, Tulsa, Oklahoma v. Ellerd, 503 F.2d 1193 (10th Cir. 1974).
 
 I.
 
 7
 Keen contends that "the judgment below should be reversed because the trial court committed reversible error in permitting safety investigators employed by the National Transportation Safety Board and the Federal Aviation Administration to testify as to ultimate conclusions and to the probable cause of the accident." Keen argues that such testimony was inadmissible under 49 U.S.C.A. § 1441(e), which provides:
 
 
 8
 No part of any report or reports of the National Transportation Safety Board relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports.
 
 
 9
 Keen further contends that under 49 C.F.R. 835.3(b), the testimony of a National Transportation Safety Board (NTSB) employee is limited to mere factual information obtained by the employee in the course of the investigation and prohibits any testimony "regarding matters beyond the scope of their investigation" or giving "opinion testimony concerning the cause of the accident."
 
 
 10
 We have not heretofore considered the degree to which NTSB employees or similarly employed government personnel may, or may not, testify in actions such as this. Several courts have construed § 1441(e), and its predecessor, § 581, to be a bar. Israel v. United States, 247 F.2d 426 (2d Cir. 1957); Lobel v. American Airlines, 192 F.2d 217 (2d Cir. 1951), cert. denied, 342 U.S. 945, 72 S.Ct. 558, 96 L.Ed. 703 (1952); Universal Airline v. Eastern Air Lines, 88 U.S.App.D.C. 219, 188 F.2d 993 (1951); Ratner v. Arrington, 111 So.2d 82 (Fla.App.1959). These decisions hold that the statute is designed to guard against the introduction of reports expressing agency views about matters more properly left to courts and/or juries to decide.
 
 
 11
 Several recent decisions have afforded § 1441(e)'s prohibition a more liberal construction. In Berguido v. Eastern Air Lines, Incorporated, 317 F.2d 628 (3rd Cir. 1963), cert. denied, 375 U.S. 895, 84 S.Ct. 170, 11 L.Ed.2d 124 (1963), the court said:
 
 
 12
 This argument blurs the essential policy and reason behind the section with other policies affecting the admissibility of evidence. The fundamental policy underlying 1441(e) appears to be a compromise between the interests of those who would adopt a policy of absolute privilege in order to secure full and frank disclosure as to the probable cause and thus help prevent future accidents and the countervailing policy of making available all accident information to litigants in a civil suit. Accordingly, the primary thrust of the provision is to exclude CAB reports which express agency views as to the probable cause of the accident. Of necessity, the opinion testimony of the CAB's investigators would also come within this rule. However, the testimony of Searle as to the calculations made by Schmidt certainly does not come within the ambit of the privilege. His was not evaluation or opinion testimony, for it reflects in no way the CAB's findings as to the probable cause of the crash. (Emphasis supplied.)
 
 
 13
 317 F.2d at pp. 631-632.
 
 
 14
 Berguido, supra, was further developed in American Airlines, Inc. v. United States, 418 F.2d 180 (5th Cir. 1969), wherein the court observed:
 
 
 15
 American Airlines' position on the reach of § 1441(e) seems thoroughly at variance with the prevailing interpretation of the statute. As stated in Berguido v. Eastern Air Lines, Inc., 3 Cir., 1963, 317 F.2d 628, 632, "the primary thrust of the provision is to exclude CAB reports which express agency views as to the probable cause of the accident". Exhibits 58 and 89 are not the report of the C.A.B. and do not reflect the Board's evaluation of the data they contain or the emphasis placed on that data in reaching a decision on probable cause. To the contrary the exhibits merely display and explain the data derived from the flight recorder foil itself, which was admitted without objection.
 
 
 16
 Appellant vigorously stresses the opinion nature of the testimony. However, Berguido established that qualified testimony going beyond merely personal observations is admissible provided such testimony does not presume to be official agency opinion. Although purporting to follow Berguido, Fidelity and Casualty Company of New York v. Frank, 227 F.Supp. 948 (D.Conn., 1964) distinguishes between "factual" testimony by investigators and "evaluation, opinion, or conclusion evidence" that is objectionable. In the context of this case it would perhaps be suitable to say that the attempt to derive information about the altitude, speed, heading, and vertical acceleration of Flight 383 was a factual inquiry. However, a very sophisticated evaluation of the data had to be made. Because of the uncertainty which the Frank rule would introduce in sorting fact from opinion, it would be better to exclude opinion testimony only when it embraces the probable cause of the accident or the negligence of the defendant. (Emphasis supplied.)
 
 
 17
 418 F.2d at p. 196.
 
 
 18
 American Airlines, Inc., supra, was analyzed and adopted in Kline v. Martin, 345 F.Supp. 31 (E.D.Va.1972). The court stated:
 
 
 19
 The NTSB is the successor to the Civil Aeronautics Board (CAB) insofar as responsibility for investigation of accidents involving civil aircraft is concerned. 49 U.S.C. § 1655(d). It argues that the testimony requested is barred by the prohibition of 49 U.S.C. § 1441(e) that "no part of any report or reports of the Board relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports." The Board also points to 14 CFR § 435 which limits the testimony of investigators to facts actually observed by them. It stresses the opinion nature of the testimony and contends that the only way to give adequate effect to and fulfill the purpose of 49 U.S.C. § 1441(e) is to exclude all evaluation evidence, citing a footnote in Israel v. United States, 247 F.2d 426, 429 (2nd Cir., 1957), and Fidelity and Cas. Co. of New York v. Frank, 227 F.Supp. 948 (D.C.Conn., 1964).
 
 
 20
 The Court finds the reasoning of American Airlines, Inc. v. United States, 418 F.2d 180 (5th Cir., 1969) persuasive, although the rule enunciated by it is not as easily applied as the total prohibition against "all evaluation, opinion and conclusion evidence" of Fidelity & Cas. Co. of New York v. Frank, supra. The American Airlines rule, which prohibits only conclusory opinions as to the ultimate issue of probable cause of the accident, seems more consistent with the policy considerations which prompted the enactment of 49 U.S.C. § 1441(e), namely, "to guard against the introduction of C.A.B. reports expressing agency views about matters which are within the functions of courts and juries to decide." Lobel v. American Airlines, Inc., 192 F.2d 217, 220 (2nd Cir., 1951). The only prohibition of the statute is against use of the report "of the Board." Despite the statement in Berguido v. Eastern Airlines, Inc., 317 F.2d 628, 632 (3rd Cir., 1963) that "Of necessity, the opinion testimony of the CAB's investigators would also come within this rule," the statute does not go that far. Even if it does, however, it is only the ultimate issue, the probable cause of the accident, that is prohibited.
 
 
 21
 345 F.Supp. at p. 32.
 
 
 22
 We are persuaded that the standards set forth in Berguido, supra, American Airlines, Inc., supra, and Kline, supra, control in the analysis and interpretation of § 1441(e). We thus hold that the trial court did not err in permitting the NTSB accident investigator and the FAA maintenance supervisor to testify relative to that which they observed at the accident scene and the manner in which they conducted their investigations. Our careful review of the record convinces us that neither of these witnesses testified to the proximate cause of the crash. In our view an absolute prohibition of testimony from agency personnel could and perhaps would in many cases involving circumstances such as those in the case at bar be not only detrimental to a private citizen proceeding as a plaintiff seeking the true facts triggering such a disaster but also in direct conflict with the Department of Transportation guidelines for NTSB investigators, which provide:
 
 
 23
 (B)oard employees may testify as to the factual information they obtained during the course of the accident investigation, including factual evaluations embodied in their factual accident reports. However, they shall decline to testify regarding matters beyond the scope of their investigation, or to give opinion testimony concerning the cause of the accident.
 
 
 24
 49 C.F.R. § 835.3(b).
 
 II.
 
 25
 Keen contends the trial court erred in permitting Detroit Diesel to call Dr. Brant as a witness in disregard of the physician-patient privilege. Keen argues that Robert Keen's health "has absolutely no probative value . . . in a product-liability action" and that even if relevant, such evidence is inadmissible under Rule 403 of the Federal Rules of Evidence which provides:
 
 
 26
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 27
 Keen argues that Detroit Diesel "turned the major issue away from whether or not the turbine shaft was defective at the time of the accident into decedent's health at the time of the accident and prior to the accident." Thus, trial court error is charged in the admission of Dr. Brant's testimony because Keen did not waive her statutory privilege to exclude the evidence. Detroit Diesel counters that any physician-patient privilege which may have existed between Robert Keen and Dr. Brant was waived by Keen both by reason of her testimony and when she presented Dr. Brant as a rebuttal witness. We agree.
 
 
 28
 The trial court carefully attempted to direct Keen's counsel relative to the discussion of Robert Keen's health. This is well evidenced by the following colloquy which occurred in chambers:
 
 
 29
 MR. NORMAN (Keen's Counsel): Your Honor, as the Court knows, we filed a motion in Limine, in which we took the position that the medical was not relevant in the case; and the Court indicated yesterday morning that the Court would permit Defendants to call medical witnesses to go to the issue of life expectancy. In order just to preserve our record on that, we wanted to make a note on the fact because I don't think it appears official in the record to this point so we would not have been held to have waived that privilege.
 
 
 30
 THE COURT: By calling Dr. Chapman (a pathologist and chief medical examiner for the State of Oklahoma who was statutorily obligated to investigate Robert Keen's death)?
 
 
 31
 MR. NORMAN: Right.
 
 
 32
 THE COURT: You are not intentionally waiving it. Where it amounts for a waiver in law is for me to determine it.
 
 
 33
 MR. NORMAN: Yes.
 
 
 34
 THE COURT: Well now, if when she (Keen) testifies, she talks about and she must in order to sustain the vast amount of her claim that she has and her children lost the future earning capacity of that man, then I think that the jury is entitled to know what his health condition was in order to make a more educated guess as to what his life expectancy may have been. I don't have any cases at point, but we always tell jurors in personal injury or death cases: You may take into consideration the age and the physical condition and all of that sort of thing.
 
 
 35
 MR. NORMAN: Our position on that, Your Honor, is that the new statute which makes the HEW Life Tables admissible without further proof corrects that situation so we can prove life expectancy just by admitting those.
 
 
 36
 THE COURT: By showing age?
 
 
 37
 MR. NORMAN: Yes, sir. That is an agreed exhibit, the HEW Life Tables.
 
 
 38
 THE COURT: Would there be any cases on that point that you know of? Off the record.
 
 
 39
 (Discussion held off the record.)
 
 
 40
 THE COURT: They are not waiving any privileges.
 
 
 41
 (R., Vol. VIII, pp. 228-229.)
 
 
 42
 Clearly, at this stage of the trial, Keen had not presented testimony or evidence relative to Robert Keen's health prior to the accident. The trial court had, accordingly, expressly ruled that Keen had not waived any physician-patient privileges.
 
 
 43
 Thereafter, however, Keen testified on direct examination relative to her husband's health:
 
 
 44
 A. On occasion when he would take his physical and there would be a recheck required, we had a gadget, a blood pressure machine that I sometimes operated to, shall I say, break down any fear or anxiety regarding having the blood pressure taken. And this seemed to help sometimes.
 
 
 45
 Q. Why did you do that?
 
 
 46
 A. Just to break down any anxieties for having the reading which would certainly affect his paycheck which certainly would affect his job. It was not a regular thing. Years and years and we wouldn't and then occasionally we would.
 
 
 47
 Q. How long had you had that?
 
 
 48
 A. Perhaps 10, 15 years. I don't really remember.
 
 
 49
 (R., Vol. VIII, pp. 314-315.)
 
 
 50
 MR. NORMAN: . . . And I think that counsel is now clearly violating those authorities (re physician-patient privilege) and I think it is necessary once again for mis-trial because of the prejudicial nature of the inferences to the jury.
 
 
 51
 THE COURT: Overruled. If the life expectancy of the husband were not an issue here, I would readily agree. But this woman seeks to recover for future earnings and loss of consortium; and therefore, I think that the health of the deceased is directly an issue and the privilege is waived by her taking the stand. She testified about his high blood pressure. So that would open the door, I think, to other areas. Overruled. (Emphasis supplied.)
 
 
 52
 (R., Vol. VIII, pp. 327-328.)
 
 
 53
 Under these circumstances we are not inclined to hold that the trial court erred in allowing Detroit Diesel to further develop Robert Keen's condition of health at the time of the crash. A contrary holding would, in our view, be in direct conflict with recent Oklahoma decisions construing waiver of the physician-patient privilege. In Herbert v. Chicago, Rock Island and Pacific Railroad Company, 544 P.2d 898 (Okl.1975), the court ruled that there was nothing in the statute granting the physician-patient privilege which prohibited a trial court from granting a continuance to allow a defendant the opportunity to depose plaintiff's physician after the plaintiff had waived the privilege during trial. In Robinson v. Lane, 480 P.2d 620 (Okl.1971), the court ruled that a plaintiff seeking recovery for damages sustained in an automobile accident waived the privilege by testifying as to the nature and extent of his injuries, thus rendering evidence relating to the time and place of his treatment and the testimony of his attending physician admissible. Keen's testimony relating to her use of a sphygmomanometer to periodically check Robert Keen's blood pressure over a period of 10 to 15 years clearly "opened the door" for further cross-examination relating to the manner and degree her deceased husband was being treated for blood pressure related problems.
 
 III.
 
 54
 Keen contends that the trial court erred in allowing counsel for Detroit Diesel to read certain request for admissions to the jury. Detroit Diesel originally served Keen with a Request for Admissions on June 10, 1974. At the same time, Detroit Diesel filed a motion to dismiss which was granted on June 26, 1974. Thus, the order of dismissal was granted before the time had lapsed for response to the Request for Admissions. Thereafter, as noted supra, the first appeal was taken. We reversed the dismissal and remanded for further proceedings.
 
 
 55
 Upon remand, the Request for Admissions was apparently not considered again by the parties until the afternoon of the second day of trial when counsel for Detroit Diesel moved for their admittance. Counsel for Keen was clearly surprised by the motion to admit the admissions in evidence, as noted by his objection:
 
 
 56
 MR. NORMAN: The plaintiff objects to all of the demand that is within the admissibility of them because plaintiff believes they were relieved of answering the demands because the case was dismissed by this Court before the time had lapsed for answering same. The plaintiff specifically objects to the question pertaining to the health, blood pressure, etc., of the deceased, which commenced with questions 21 and subsequent questions.
 
 
 57
 (R., Vol. VIII, p. 359.)
 
 
 58
 The motion relative to the admissions by counsel for Detroit Diesel and their admission in evidence by the trial court, was improper. The practice is particularly questionable when, as here, the Request for Admissions was not offered or set forth within the pre-trial order. However, counsel were allowed to present conflicting evidence on the very matters admitted and counsel vigorously argued the merits of the conflicting evidence to the jury without objection from counsel for Keen or the trial court just as though the admissions had not been admitted. Furthermore, the trial court did not instruct the jury that it was to consider the admissions and, in fact, the court's instructions clearly recognized that the jurors were presented with conflicting evidence and credibility determinations within their sole discretion. At no time or in any wise did the trial court instruct the jurors that they were to ignore the conflicting evidence in light or favor of the admissions. The trial court did not instruct relative to the admissions, indicating, we believe that the error was thus recognized. Given these circumstances, and while recognizing that all trial court errors are not prejudicial, we must determine whether the admittance of the Request for Admissions gave rise to clear error necessitating reversal.
 
 
 59
 In most cases, such as here, there should be a clear relationship between the request for admissions and a pre-trial order. The purpose of Fed.Rules Civ.Proc. rule 36, 28 U.S.C.A. (Rule 36) allowing for the admission of facts and the genuineness of documents was promulgated in order to expedite trials by establishing as true certain material facts of a case without the necessity of formal proof at trial. Champlin v. Oklahoma Furniture Manufacturing Company, 324 F.2d 74 (10th Cir. 1963); Peter v. Arrien,319 F.Supp. 1348 (D.Pa.1970). Once admitted, the parties are bound thereby and by stipulations included in a pre-trial order. Associated Press v. Cook,513 F.2d 1300 (10th Cir. 1975). The trial court may properly reject contentions of parties that raise issues at trial which are not included in a pre-trial order. Southern Pacific Transportation Company v. Nielsen, 448 F.2d 121 (10th Cir. 1971). Furthermore, amendment of a pre-trial order formulating issues will be permitted during trial only if necessary to prevent manifest injustice. Monod v. Futura, Inc., 415 F.2d 1170 (10th Cir. 1969).
 
 
 60
 Applying these standards to the problem involving the request for admissions in the instant case, we hold that the trial court erred in admitting them in evidence. However, under the totality of the facts and circumstances, the error was harmless. It was not clear error requiring reversal. The admitted requests were largely of a historical, descriptive nature. Only No. 15, which stated that the plane struck the ground "in a near vertical nosedown position and at a high speed," and Nos. 21-26, which dealt with Robert Keen's medical certification and high blood pressure problems, are strenuously objected to by Keen on appeal. The record reflects that Keen was not prohibited from arguing that the facts in evidence established that the plane did not hit the ground in a near vertical position and that Robert Keen was not suffering any physical infirmity at the time of his death. Furthermore, Keen had already waived the physician-patient privilege by putting her deceased husband's health in issue. It is further significant that neither counsel for Detroit Diesel nor the trial court at any time following the admission of the Requests made further or other reference thereto. Accordingly, there is substantial reason to believe that the jury determined its verdict based on the disputed trial evidence. We thus hold that the admission of the Request for Admissions was harmless error. We do not, of course, condone this practice.
 
 
 61
 WE AFFIRM.
 
 
 62
 McKAY, Circuit Judge, concurring in part and dissenting in part:
 
 
 63
 While I concur in Parts I, II and the principal conclusions of Part III, I must respectfully dissent from the conclusion that the clear error found in Part III is harmless.
 
 
 64
 This case turns entirely on whether a dead pilot or a dead engine caused the plane in question to crash. In turn, the two items of evidence which were clearly determinative of this issue were: (1) the angle of impact of the plane, and (2) whether the pilot was a prime candidate for a heart attack. As the majority opinion correctly holds, the trial court erroneously permitted defendant to read to the jury that the plaintiff had admitted to defendants' version of the facts on both these critical issues. It is obvious that the introduction in this trial court proceeding of unanswered admissions requested in a prior action violated Rule 36(b) of the Federal Rules of Civil Procedure which provides that "(a)ny admission made by a party under this rule is for the purpose of the pending action only and is not an admission by him for any other purpose nor may it be used against him in any other proceeding." Here the admission was used against plaintiff to directly contradict her own prior assertions and evidence.
 
 
 65
 I am unable to agree with the majority, however, that this plain error was harmless. In fact, the very nature and context of the error is indicative of its harmfulness. Rule 36(b) explicitly provides that "(a)ny matter admitted under this rule is conclusively established." Thus, the harm caused by erroneous introduction of Rule 36 admissions whose weight is conclusive is potentially much greater than the harm resulting from the erroneous introduction of other evidence whose weight in the calculus of preponderance of the evidence is left to the jury. Although the trial court did not instruct that the admissions were conclusive, the reading of the admissions to the jury was immediately preceded by the following court instruction:
 
 
 66
 The circumstances (under which the defendants' attorney is reading these admissions) are that they were submitted to the Plaintiff and the Plaintiff did not answer them; therefore, they are deemed to be admitted under the law.
 
 
 67
 Transcript of Proceedings at 354-55. The giving of a special instruction in conjunction with the introduction of facts "deemed to be admitted under the law" surely focused the jury's attention on the admissions. Furthermore, all this was done after the plaintiff had rested, having presented credible testimony which standing alone would show it was a dead engine, not a dead pilot, that caused the crash.[1] To compound the error, the admissions came as a surprise to the plaintiff because no pretrial order had been made which referred to them. To further accentuate the impact, they were injected into the record in the middle of the testimony of defendants' expert witness at a point clearly calculated to emphasize to the jury the significance of such admissions on the issue of dead pilot versus dead engine.[2]
 
 
 68
 Whatever the harmless error rule may mean, it surely cannot mean it is harmless to erroneously instruct the jury that the plaintiff had admitted the key elements of the defendants' case as a matter of law. The various tests for harmless error have been developed in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and its progeny. As thoroughly analyzed in Field, Assessing the Harmlessness of Federal Constitutional Error A Process in Need of a Rationale, 125 U.Pa.L.Rev. 15 (1976), the tests are: (1) whether the erroneously admitted evidence might have contributed to the verdict; (2) whether, once the erroneously admitted evidence is excluded, there remains overwhelming evidence to support the jury verdict; and (3) whether the tainted evidence is merely cumulative. While in a civil case none of these tests must be met beyond a reasonable doubt as required in questions of constitutional error in a criminal case, this court must at least be satisfied that it is highly probable that the error did not influence the verdict.[3]
 
 
 69
 Under the first test, it would be difficult to design an error more calculated to influence the verdict. After plaintiff's case in chief in which she fully developed her theories, and at a point optimally designed to demonstrate to the jury the significance of the erroneous evidence, the court in effect not only instructed the jury that plaintiff had admitted defendants' theory of the case, but by implication that it was bound as a matter of law to treat plaintiff's preceding testimony on the critical points as false. Unless we are to adopt the novel view that the jury disregarded the instructions of the court, we must conclude that the error not only contributed to the verdict but in essence amounted to a directed verdict on the critical points.
 
 
 70
 In light of plaintiff's substantial scientific evidence and the opinion of a qualified expert contradicting the illegally read admissions, it would seem a perversion of the rule to suggest that defendants' properly admitted evidence could be called "overwhelming" under the second test. Absent the erroneous admissions and the simultaneous spotlighting by jury instruction, a search of the whole record suggests that the evidence was fairly evenly balanced. Plaintiff introduced direct and circumstantial evidence and expert opinion, while defendants introduced only circumstantial evidence and expert opinion.
 
 
 71
 Finally, since there were no other admissions read into the record, these erroneously introduced admissions could not have been cumulative.
 
 
 72
 To call this error harmless would be to suggest that the admission of an illegally obtained confession in a criminal case would be harmless error when the government otherwise relied entirely on circumstantial evidence. No such conclusion can be supported either by logic or the cases.
 
 
 73
 In light of this obviously harmful error, the case should be reversed and remanded for a new trial.
 
 
 
 [1]
 The testimony of plaintiff's expert directly contradicted the statements which the jury instruction declared were admitted to by plaintiff. For example, in contrast to the admission which stated the aircraft "struck the ground . . . in a near vertical nosedown position and at a high speed," Transcript of Proceedings at 357, plaintiff's expert testified that the attitude of the aircraft at impact "was at a near glide path with a straight down turn," Transcript of Proceedings at 161
 
 
 [2]
 The apparent paradox of why the court permitted plaintiff to put on evidence contrary to the admissions (which contravenes the rule that properly obtained admissions are conclusive, F.R.C.P. 36(b)) is very simply explained. Apparently to achieve maximum effect defendants sprung their little surprise after the plaintiff rested and in the middle of their own testimony. The court's failure to include an instruction to the jury on admissions at the end of the case can be explained by the fact that it had already instructed the jury, immediately prior to the reading of the admissions
 
 
 [3]
 An excellent discussion of the differences between criminal and civil harmless error may be found in R. Traynor, The Riddle of Harmless Error (1970)